AO 106 (Rev. 04/10) Application for a Search Warrant

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

FEB 14 2019

DOUGLAS F. YOUNG, Clerk

By _____
Deputy Clerk

# UNITED STATES DISTRICT COURT

for the

Western District of Arkansas

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Two (2) Apple iPhone cellular telephones | )<br>)<br>)<br>)<br>)<br>)    Case No. 5:19 CM 14 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 & A-2.

located in the _____ Western _____ District of _____ Arkansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Distribution of Controlled Substances |
| 21 U.S.C. 846 | Conspiracy |

The application is based on these facts:

See attached Affidavit of H.S.I. T.F.O. Tracy Brown

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

HSI TFO Tracy Brown
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/14/19

_____
*Judge's signature*

City and state: Fayetteville, Arkansas

Hon. Erin L. Wiedemann, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

The property to be searched is described as an Apple iPhone Model A1784. The cellular telephone is currently in the possession of Homeland Security Investigations, located at: 3419 N. Plainview Avenue, Fayetteville, Arkansas. The Apple iPhone has a red after-market film affixed to the front. The remainder of the phone's exterior is black. The "Apple" brand logo appears on the back of the device. This warrant authorizes the forensic examination of the described and photographed Apple iPhone cellular telephone for the purpose of locating the electronically stored information described in Attachment B.

 

## ATTACHMENT A-2

The property to be searched is described as an Apple iPhone. The cellular telephone is currently in the possession of Homeland Security Investigations, located at: 3419 N. Plainview Avenue, Fayetteville, Arkansas. The Apple iPhone is light-blue in color. The "Apple" brand logo appears on the back of the device. This warrant authorizes the forensic examination of the described and photographed Apple iPhone cellular telephone for the purpose of locating the electronically stored information described in Attachment B.




## ATTACHMENT B

### *INFORMATION TO BE SEIZED BY THE GOVERNMENT*

All records and information on the device described in Attachment A that constitutes evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), & 846, including:

a.  All internet browsing history, as well as telephonic, text, and electronic mail messages between Jorge SANDOVAL and other persons, known and unknown, regarding the unlawful acquisition, disposition, and/or transfer of controlled substances or controlled substance analogues; information regarding the payment(s) for the controlled substances or controlled substance analogues; or the acquisition, transfer, or concealment of assets, money, or proceeds by any means;

b.  All bank records, wire transfer records, bank statements, tax records, tax returns, financial records and notes, checks, credit card bills, account information, and other financial records;

c.  Correspondence, notations, logs, receipts, journals, records, and other documents noting the price, quantity and/or times when controlled substances or controlled substance analogues were obtained and/or sold;

d.  Any and all address books, telephone records, telephone books, date books, calendars, payment records, and telephone bills and documents and other items reflecting names, addresses, and telephone numbers;

e.  Records, documents, and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items, obtained with the proceeds from the illegal sale of controlled substances or controlled substance analogues and related activities;

f.  Records of off-site locations to store records or controlled substances, including safe deposit keys, records, receipts, rental agreements for storage facilities;

g.  Mementos, including photographs, and other historical keepsake items which document the association of co-conspirators, with each other and other suspected associates involved in the illegal sale of controlled substances and controlled substance analogues and money launders as well property or assets purchased with illegal proceeds;

h.  Lists of customers and related identifying information;

i.  Types, amounts, and prices of controlled substances and controlled substance analogues trafficked, as well as dates, places, and amounts of specific transactions;

j.  Text messages and other communications stored on the electronic devices relating to the trafficking of controlled substances and controlled substance analogues, money laundering, or identification of co-conspirators;

k. Any information related to the sources of drugs (including names, addresses, phone numbers, or any other identifying information);

l. Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, deleted, such as logs, phonebooks, photographs, saved usernames and passwords, documents, spreadsheets, and browsing history;

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Tracy Brown, Task Force Officer with Homeland Security Investigations,

Fayetteville, Arkansas, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     This affidavit is being submitted in support of an application for a

search warrant for evidence believed to be contained in an Apple iPhone Model

A1784 (hereinafter referred to as "Subject Telephone 1") and a blue Apple iPhone

(hereinafter referred to as "Subject Telephone 2"). The subject telephones are

described herein and in Attachment A-1 (Subject Telephone 1) and Attachment

A-2 (Subject Telephone 2), and the items to be seized are described herein and in

Attachment B. Because this Affidavit is being submitted for the limited purpose

of establishing probable cause to search the subject telephone, it does not include

all of the information known to me as part of this investigation, but only

information sufficient to establish probable cause for the requested search

warrant.

2.     I have been a police officer and detective with the Bentonville

Police Department for over 19 years.  Since 2013, I have held the rank of

Detective Corporal assigned to the Narcotics Unit, a component of the Criminal

Investigations Division. Prior to working for Bentonville Police Department, I

was employed by the Benton County Sheriff's Office for three years.

Additionally, I served in the United States Air Force as a Law Enforcement

Specialist for four years. In 2014, I became a task force officer with Homeland

1

Security Investigations after completing the Title 19 Cross-Designation Course. As such, I am authorized to investigate and enforce federal law, including the application for and execution of search warrants. Additionally, I have completed the Arkansas Narcotics Officer Certificate Program. Lastly, I have received specialized training in, among other things, (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, harboring, shielding, smuggling and employment of illegal aliens and of the laundering and concealment of proceeds of drug trafficking; (b) surveillance; (c) analysis of documentary and physical evidence; (d) conducting undercover operations; (e) preparing and executing state and federal search warrants and arrest warrants; (f) collecting information to further investigations; and (g) arresting individuals involved in drug trafficking violations. I also have experience in investigations involving the interception of wire communications.

      3. Regarding the business of illegal narcotics trafficking, I am also aware of the following things based upon my training and experience:

      i.  That drug dealers very often place assets, including accounts at financial institutions, in names other than their own to avoid detection by government or other law enforcement agencies.

     ii.  That even though these assets are in other names, the drug dealers continue to use these assets and exercise dominion and control over them.

2

iii.   That drug dealers frequently maintain on-hand amounts of United States currency in order to maintain and finance their ongoing illegal drug business.

iv.   That drug dealers often maintain books, records, receipts, notes, ledgers, computers, computer disks, tickets, money orders, cashier's checks, wire transfer receipts, and similar drug related financial documents and records pertaining to the transportation, ordering, sale and distribution of illegal drugs. Furthermore, such documents are often written in code.

v.   That drug dealers commonly front (provide illegal drugs on consignment) to their clients and often keep the aforementioned items so they can account for their drugs, the money owed for these drugs, and who has or owes for these drugs.

vi.   That the aforementioned books, records, receipts, notes, ledgers, tickets, money orders, cashier's checks, and similar financial documents and records, including computers, computer disks, diskettes, and hard drives,

and other media are maintained where the drug dealers have ready access to them.

vii.   That it is common for drug dealers to conceal contraband, large amounts of currency, precious metals, jewelry, address lists, telephone lists, proceeds of drug sales, and records of drug transactions in secure locations within their residences, yards,

3

garages, offices, businesses, automobiles, safes, safe deposit boxes, and obscure locations known only to them, i.e., mail drops, mini storage warehouses, etc., for ready access and to conceal the same from law enforcement authorities.

viii. That persons involved in illegal drug trafficking conceal in their residences, yards, offices, businesses, safes, garages, storage buildings, vehicles, safe deposit boxes, and obscure locations, caches of drugs, large amounts of currency, weapons, financial instruments, precious metals, jewelry, and other items of value and/or proceeds from drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of money made from engaging in illegal drug trafficking activities.

ix. That drug dealers often purchase expensive vehicles, businesses and residences with the proceeds from their drug transactions. Also, that drug dealers frequently change vehicles and register vehicles in other names to avoid detection by law enforcement personnel.

x. That drug dealers amass large proceeds from the sale of illegal drugs, they often attempt to legitimize their profits and maintain evidence of financial transactions relating to the obtaining, transferring, secreting or spending of large sums of money derived from their illegal drug distribution activities.

4

xi.  That to accomplish these goals, drug dealers utilize, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, business fronts, telephones, cellular telephones, facsimile machines, digital and various paging devices, and two-way radio systems. Furthermore, drug dealers frequently change telephone numbers, paging devices and telephone instruments.

xii.  That drug dealers commonly maintain addresses and telephone numbers in books or papers which reflect names, alias names, addresses, and telephone numbers for their associates in their illegal drug trafficking.

xiii.  That drug dealers take or cause to be taken photographs, video and

xiv.  digital audiotapes of themselves, their associates, their property, and their illegal products. Furthermore, these drug dealers often maintain these photographs, video and audiotapes in their residences, offices, safes, garages, storage buildings, vehicles and safe deposit boxes.

xv.  That drug dealers frequently keep paraphernalia for packaging, diluting,

xvi.  weighing, and distributing the illegal drugs. Furthermore, this paraphernalia includes, but is not limited to, scales, plastic bags,

5

diluting agents, boxes, trash compactors, heat sealers, and sealing tape.

xvii. That the courts have recognized that unexplained wealth is probative

xviii. evidence of crimes motivated by greed, and in particular, illegal trafficking in controlled substances.

xix. That drug traffickers very often possess firearms and other weapons for

xx. the purpose of protecting their drug trafficking enterprises from the efforts

xxi. of law enforcement authorities as well as from persons who might attempt to steal any drugs or money possessed by the drug traffickers.

xxii. Affiant is aware that drug traffickers often maintain extra residences as

stash houses, meeting locations, and temporary housing for drug associates. Furthermore, these residences are frequently rented, purchased or titled in others' names even though the residences remain in the control of the drug traffickers.

xxiii. In the Affiant's experience as an investigator, it has been found that illegal drug trafficking is frequently a continuing activity over months and even years. Illegal drug traffickers typically will obtain and distribute controlled substances on a regular basis much as a

6

distributor of a legitimate commodity would purchase stock for sale, and similarly, such drug traffickers will have an inventory which will fluctuate in size depending upon the demand for the product. The Affiant expects the drug trafficker to keep records of his illegal activities for a period extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which he might still be owed money or might owe someone else money. Drug traffickers frequently use third parties to transport shipments of illegal drugs and cash proceeds from the sale of illegal drugs. These third parties use a variety of methods to transport shipments of illegal drugs and cash, including automobiles.

4.     I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other agents of HSI and other law enforcement officers.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another HSI agent or law enforcement officer.  Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.  In addition, this affidavit is based on information from the following sources:

7

i.   Oral and written reports about this and other investigations which I have received from federal agents and local law enforcement;

ii.  Physical surveillance conducted by federal agents and task force officers (TFO), or local law enforcement agencies, the details of which have been reported to me either directly or indirectly;

iii. A review of telephone toll records, and subscriber information;

iv.  Public records;

v.   A review of audio recordings resulting from consensually monitored meetings involving a reliable confidential informant and the target of the investigation;

vi.  Information provided by reliable confidential informant; and

vii. My training and experience as a task force officer and the training and experience of other law enforcement officials, including other HSI special agents and task force officers.

5.   Based on the facts set forth in this affidavit, there is probable cause to believe that the property described in Attachment A-1 and Attachment A-2 has been used to commit violations of 21 U.S.C.§ 841(a)(1), 846 and 856(a)(1) and (a)(2) as provided in 18 U.S.C. § 2.  There is also probable cause to believe that the items to be seized described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of additional individuals who are engaged in the commission of these offenses.

## PROBABLE CAUSE

8

6.    In November 2017, HSI special agents and task force officers began an investigation into the distribution of controlled substances, specifically methamphetamine, by an individual identified by a confidential source (hereinafter referred to as "CS"[1]) as "Ramiro," and another, identified as "Jorge,". The CS explained that s/he came to meet "Ramiro" and "Jorge" at a regularly occurring event that takes place outside the Western District of Arkansas.

7.    In February 2018, the CS spoke with "Ramiro" and "Jorge" about the sale of crystal methamphetamine. In doing so, the CS reported that "Jorge" and "Ramiro" were to charge the CS $600.00 per ounce if the drugs were delivered to the CS in Northwest Arkansas. The price dropped to $500.00 per ounce if the CS drove to Tulsa to make the purchase. Lastly, the CS was provided with the telephone number 918-856-8317 for "Jorge" and telephone number 918-812-7331 for "Ramiro".

8.    HSI special agents and task force officers conducted open-source research on the telephone numbers assigned to "Jorge" and "Ramiro". According to credit-derived records, the 918-856-8317 ("Jorge) is associated to Jorge SANDOVAL-Iruega of 3710 W. 36 Street North, Tulsa, Oklahoma, while telephone number 918-812-7331 ("Ramiro") is associated with Ramiro VERGARA of 13636 E. 580 Road, Inola, Oklahoma. HSI special agents also

---

[1] The CS, who has received consideration on State of Arkansas and Federal charges, has provided information that has proven to be reliable, as it has been corroborated through the examination of phone records, surveillance, and controlled purchases of methamphetamine by the CS.

learned that T-Mobile Communications is the service provider for the number possessed by "Jorge."

9.      On March 1, 2018, at the direction of HSI special agents and task force officers, the CS contacted VERGARA and inquired about purchasing crystal methamphetamine. The CS reported that VERGARA agreed to sell crystal methamphetamine to the CS the following evening. On March 2, 2018, while driving to the Tulsa, Oklahoma area to meet VERGARA, the CS received a telephone call from VERGARA. During the telephone call, VERGARA provided the CS with his address (13636 E. 580 Road, Inola, Oklahoma). The CS drove to VERGARA's as instructed and purchased approximately 2 ounces of crystal methamphetamine for $1,300.00 in a controlled transaction.    The crystal methamphetamine was submitted to the Drug Enforcement Administration's (DEA) laboratory for analysis. According to the DEA laboratory, the substance purchased was "d-Methamphetamine Hydrochloride" (crystal methamphetamine), had a net weight of 55.60 grams and a purity of 97%.

10.     On March 5, 2018, T-Mobile was served with a Department of Homeland Security (DHS) subpoena for subscriber information and call detail records for the telephone number used by "Jorge" (918-856-8317).    On March 28, 2018, T-Mobile complied with the DHS subpoena by providing the requested data. According to T-Mobile, telephone number 918-856-8317 is subscribed to by Jorge A. SANDOVAL Iruegas of 6415 N. Madison Avenue, Tulsa, OK 74126. Credit-derived, open-source information revealed that 6415 N. Madison Avenue is a former address of SANDOVAL. The account was established on June 6,

10

2016, and remained active until SANDOVAL'S arrest, describe below.   In reviewing the call detail records, HSI special agents noted that SANDOVAL and VERGARA communicated with one another on at least 121 separate occasions between December 8, 2017 and March 5, 2018.

11.     In April 2018, the CS placed a consensually monitored telephone call to SANDOVAL at telephone number 918-856-8317. SANDOVAL answered the telephone and proceeded to speak with the CS about the sale / purchase of a large quantity of crystal methamphetamine.  Over the course of the next several weeks, the CS spoke with SANDOVAL about the sale of methamphetamine.  On April 17, 2018, SANDOVAL told the CS that he would sell the CS one (1) pound of crystal methamphetamine for $6,500.00.  The CS and SANDOVAL agreed to meet later to conduct the transaction.

12.     On April 23, 2018, HSI special agents applied for and received a federal search warrant (5:18CM46) authorizing real-time location tracking for "Jorge's" telephone (918-856-8317).   The order was provided to T-Mobile Communications, who began providing geographical location data[2].

13.     On May 1, 2018, the CS reported that SANDOVAL could meet to sell the crystal methamphetamine the following day (May 2, 2018).  On May 2, 2018, the CS, while under constant surveillance of law enforcement, met SANDOVAL, who was accompanied by VERGARA, in the Western District of Arkansas. HSI special agents and task force officers observing the meeting noted

---

[2] T-Mobile Communications provides geo-location information in 15-minute intervals.

that SANDOVAL and VERGARA arrived in a Dodge Caravan bearing Oklahoma license plate HRZ252. It should be noted that HSI special agents and task force officers have observed this vehicle at the 3710 W. 36th Street North, Tulsa, Oklahoma, the known residence of SANDOVAL, on multiple occasions. During the meeting, SANDOVAL provided the CS with a box containing the agreed upon crystal methamphetamine. The CS provided SANDOVAL with the $6,500.00 in buy money. After the meeting with SANDOVAL and VERGARA concluded, the CS provided the purchased contraband to the HSI special agents and task force officers overseeing the operation. The contraband was subsequently submitted to the DEA's laboratory for testing. On May 25, 2018, the DEA laboratory reported that the contraband purchased from SANDOVAL and VERGARA on May 2, 2018, was "d-Methamphetamine Hydrochloride" (crystal methamphetamine), had a net weight of 454.9 grams and a purity of 99%.

14. After concluding the above-summarized purchase of crystal methamphetamine from SANDOVAL and VERGARA, HSI special agents and task force officers conducted analysis of location information for SANDOVAL's telephone, as provided by T-Mobile (see paragraph 13). The analysis revealed that SANDOVAL's telephone (i.e. SANDOVAL) was at or near his residence (3710 W. 36 Street, North, Tulsa, Oklahoma) for several hours prior to meeting the CS. SANDOVAL only left his residence after receiving a consensually monitored telephone call from the CS advising SANDOVAL that the CS was en route to the meeting location. After departing his residence, SANDOVAL was observed traveling eastbound from Tulsa. SANDOVAL made a brief stop,

12

approximately 30 minutes, at or near VERGARA's residence in Inola, Oklahoma, before continuing eastbound toward the Western District of Arkansas. Location data for the time-period covering the actual sale of methamphetamine to the CS detailed that SANDOVAL was at or near the buy location. It should be noted that HSI special agents and task force officers confirmed SANDOVAL and VERGARA's presence at the sale. Finally, after the sale was completed, SANDOVAL and VERGARA were observed by HSI special agents and task force officers traveling westbound into Oklahoma. Location data for SANDOVAL's telephone confirmed that he returned to Tulsa.

15. On August 15, 2018, special agents and task force officers with HSI and the DEA executed a federal search warrant (18-MJ-102-FHM) at SANDOVAL's residence (3710 West 36 Street, North, Tulsa, Oklahoma). The search of SANDOVAL's residence resulted in the seizure of several bundles that were found to contain over 19 pounds of marijuana. During an interview, SANDOVAL stated that he communicated with others engaged in the trafficking of the marijuana via a third-party application on his cellular telephone. During the search of his residence, SANDOVAL's cellular telephone, an Apple iPhone, was located and seized (Subject Telephone 1). The Apple iPhone (Subject Telephone 1) was transported to HSI Fayetteville where it was retained as evidence.

16. On December 13, 2018, SANDOVAL was charged, via indictment, with violation of Title 21 U.S.C. § 841(a)(1) and 846 – Conspiracy to Distribute Methamphetamine and violation of Title 21 U.S.C. §§ 841(a)(1),

841(b)(1)(A)(viii) Distribution of More Than 50g Actual Methamphetamine. On January 23, 2019, special agents and task force officers with HSI traveled to 3710 West 36 Street, North, Tulsa, Oklahoma to arrest SANDOVAL. SANDOVAL was not at the residence but was located at his place of employment. Upon contacting SANDOVAL, he was advised of the arrest warrant and taken into custody. SANDOVAL was searched and an Apple iPhone (Subject Telephone 2) was located on his person. SANDOVAL was subsequently transported to Fayetteville, Arkansas and turned over to the U.S. Marshals Service. The Apple iPhone (Subject Telephone 2) was retained by HSI as evidence.

17.     Based on the foregoing, your Affiant believes that probable cause exists to believe there is located on Subject Telephone 1 and Subject Telephone 2 which were seized from the possession of SANDOVAL, described in detail in Attachments A-1 and A-2, evidence of violation of Title 21 United States Code, § 841 (a)(1), 846 and 856(a)(1) and (a)(2) as provided in 18 U.S.C. § 2.

## PROCEDURS FOR ELECTRONICALLY STORED INFORMATION

18.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini computers allowing for electronic mail services, web services and rudimentary word

14

processing.  An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.   Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.  This process is time and labor intensive and may take weeks or longer.

19.    Following the issuance of this warrant, I will collect the subject cellular telephones and subject them to analysis.  All forensic analysis of the data contained within the telephones and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

20.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The

personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

21. Based upon the foregoing, including the information provided by the confidential source, the observations made by investigators, and the evidence collected, your Affiant believes that evidence, fruits, and instrumentalities of criminal activity in violation of Title 21 United States Code, Sections 841(a)(1) and 846 and Title 18 United States Code, Section 2, specifically those items detailed in Attachment B, currently exists on the property identified in Attachment A-1 and Attachment A-2.

Respectfully submitted,

Tracy Brown
Task Force Officer, HSI

Subscribed and sworn to before me on February 14, 2019

Hon. Erin L. Wiedemann
United States Magistrate Judge